UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | : |
| | : CHAPTER 11 |
| FEDERAL IDENTIFICATION CARD CO., INC. d/b/a PTM SPORT, | : |
| | : |
| Debtor. | : BANKRUPTCY NO. 16-13496(AMC) |
| | : |
| | : |

**MOTION OF FEDERAL IDENTIFICATION CARD CO., INC. D/B/A PTM SPORT FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 363 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 9013 (I) APPROVING FORM, MANNER AND NOTICE  OF BIDDING PROCEDURES, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (III) ASSUMING AND ASSIGNING CONTRACTS UNDER 11 U.S.C. §365, AND (IV) <u>GRANTING RELATED RELIEF</u>**

Federal Identification Card Co., Inc. d/b/a First Service Restoration (the "Debtor" or

"First Service Restoration"), by and through undersigned, proposed counsel, Ciardi Ciardi &

Astin, hereby submits this motion for the entry of an order (I) approving the form, manner and

notice of bidding procedures, (II) authorizing the sale of assets, described herein, free and clear of

liens, claims and encumbrances (III) assuming and assigning contracts under 11 U.S.C. §365, and

(IV) granting related relief (the "Motion"), and in support thereof, respectfully avers as follows:

<u>JURISDICTION</u>

1.        The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and

1334. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O).  Venue is

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief

requested herein are §§105 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy

Procedure 2002, 6004 and 9013.

## BACKGROUND

2.       On May 17, 2016 (the "Filing Date"), the Debtor filed a voluntary petition for reorganization pursuant to chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

3.       Since the Filing Date, the Debtor has remained in possession of its assets and continued management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.       An official committee of unsecured creditors (the "Committee") has not been appointed as of the filing of the Motion.

5.       Since 1975, PTM Sport has been a leader in screen printing apparel and accessories. With the addition of embroidery equipment and digitizing in 2007, its ability to serve every customer's needs with any size order faster than the competition is the hallmark of nationwide success. PTM Sport's 18,000 square foot facility is located in Drexel Hill, Pennsylvania. PTM Sport assists clients with creating the recognition their companies deserve with quality promotional products used for marketing their brands. Every order receives the same attention to detail. Each client receives the highest commitment to service. PTM Sport serves Fortune 500 companies as well as local businesses, schools, clubs and families. Its commitment to quality, exceptional customer service, and competitive pricing in conjunction with its state of the art production capabilities make PTM Sport the best choice for promotional product needs.

6.       Approximately eight (8) weeks prior to the Petition Date, the Debtor retained The Accelerx Group (the "Broker"), a business broker, to market the Debtor's business for sale and/or obtain financing on behalf of the Debtor.  The Broker actively marketed the Debtor's

2

business within the silk screening and embroidery markets and locally among investors and similarly situated businesses.  An example of the Broker's marketing materials is attached hereto as Exhibit "B".

7.      Through the efforts of the Broker, the Debtor secured an Asset Purchase Agreement (the "APA") attached as Exhibit "A" for the sale of substantially all of the assets that are currently owned by the Debtor and used in its business, specifically including, without limitation, all inventory, materials, work-in-progress customer engagements, all machinery, all other tangible assets, all customer contacts for future engagements, all intellectual property, all fictitious names and trademarks of the Debtor, all accounts receivable, customer lists and mailing lists, and all books and records of the (the "Assets") to PTM Promotional, LLC or its assignee (the "Buyer") for $413,000 (as defined in the APA, the "Purchase Price").

8.      The APA contemplates the sale of the Assets to the Buyer for the Purchase Price. The Buyer is unrelated to the Debtor or any of the Debtor's affiliates, officers, or agents.  The Debtor intends to finalize any needed revisions, schedules or exhibits to the APA prior to the Bid Procedures Hearing requested herein and submit the same for approval.

9.      The Debtor proposes a distribution of the sale proceeds to satisfy secured creditors with liens on the assets to be transferred and priority unsecured claims with the remaining proceeds made available for unsecured creditors.

10.      The Debtor avers that, with the sale of the Assets, as set forth in the APA, the contemplated sale provides the best-case scenario for a reasonable and substantial payment to creditors.

3

11.     Currently, the Debtor has cash on hand, projected collections and a proposed DIP Facility (as that term is defined in the APA) from the Buyer that will allow the Debtor to continue to operate through a proposed sale process.  Given the nature of the Debtor's business, customers may be reluctant to place new orders as a result of the bankruptcy which the Debtor avers, coupled with cash constraints, will warrant expedited consideration.

## BIDDING PROCEDURES

12.     The Debtor also seeks to sell the Assets subject to higher and better offers.

13.     Accordingly, the Debtor requests authority to continue to market the Assets and solicit bids pursuant to certain written procedures (the "Bidding Procedures") in order to entertain higher and better offers and confirm the highest best offer at the Sale Hearing.

14.     Any party, who complies with the bidding procedures, wishing to submit a higher or better offer on the Assets, may do so at the time of the hearing on the Motion.

15.     As of the date of the filing of this Motion, the Debtor is unaware of other potential bidders for the Assets, and, therefore, will entertain all bids.   The Debtor intends to serve notice on all parties who contacted the Broker.

## THE BASIS FOR RELIEF AND THE REASONS THEREFOR

16.     By this Motion, the Debtor seeks the entry of two (2) orders by the Court:

   a) an order to be entered outlining the procedure for entertaining higher and better offers at the Sale Hearing (the "Bidding Procedures Order"); and

   b) an order to be entered at the Sale Hearing pursuant to section 363 of the Bankruptcy Code approving the sale of the Property free and clear of liens, claims, encumbrances and interests (the "Sale Approval Order").

4

17.     Each of these orders and the reasons and authority for the entry thereof are discussed in detail in the Motion.

## THE BIDDING PROCEDURES ORDER

18.     The Debtor seeks entry of an order approving bidding procedures for the Auction and Sale Hearing to encourage only serious offers for the Assets and promote a productive and business-like Auction and Sale Hearing.

19.     The proposed bidding procedures provide that, in order to be considered higher and better than the offer of the Buyer ("Pending Offer") pursuant to the APA, competing bids made at the Sale Hearing must satisfy all of the following criteria (any such bid hereinafter referred to as a "Qualified Bid"):

  a. Only Buyer and a party who has submitted a Qualified Bid may bid at the Sale Hearing;

  b. A Qualified Bid must meet the following conditions:

    (i)  Any party desiring to make a bid for the Property shall submit a bid in writing by 5:00 p.m. at least 24 hours prior to the Sale Hearing to (i) counsel for the Debtor, Ciardi, Ciardi & Astin, 2005 Market Street, Suite 3500, Philadelphia, PA 19103, Attn: Albert A. Ciardi, III, Esquire and Jennifer C. McEntee, Esquire, with a copy to (ii) Office of the United States Trustee, 833 Chestnut Street, Ste. 500, Philadelphia, PA 19103 (iii) counsel for the Lenders, and  (iv) counsel for the Buyer, Barry Kleban, Esquire of

5

McElroy, Deutsch, Mulvaney & Carpenter, LLP, One Penn Center – Suburban Station, 1617 JFK Blvd., Suite 1500, Philadelphia, PA 19103-1815. The bidder shall have the obligation to confirm its bid status. The minimum bid will be $453,000. Such bid shall include an execution ready asset purchase agreement fully delineating all terms of the offer with any financing or due diligence contingency waived as of the Sale Hearing.

      (ii)   the maker of such bid must provide to counsel for the Debtor reasonably satisfactory evidence of financial capability and good faith intent to fulfill all of the terms and conditions of any submitted asset purchase agreement on a timely basis, accompanied by payment of an initial deposit in available funds in the amount of the $40,000, which shall be refunded to any unsuccessful bidder, as soon as practicable after the conclusion of the Sale Hearing; and

      (iii)   any dispute as to any bidder's intent or ability shall be resolved by the Court at the Sale Hearing;

c. At the Sale Hearing, the Debtor shall decide which of the bids is the highest and best offer and shall submit that Bid to the court at the Sale Hearing.

d. Any initial counter bid for the Assets must exceed the Purchase Price by $25,000 and all bid increments shall be in multiples of no less than $25,000.

e. Any offer that fails to meet any of the aforementioned factors shall not be deemed a higher and better offer.

6

f.  No bidder is required to submit a bid in the same format as any other bidder. This is designed to encourage bidders to make the best offer possible without restricting such bidder to another bidder's format. However, if bids in other formats are submitted (i.e., bids for other assets other than the Assets), then the Debtor, for purposes of considering "Qualified Bids," shall compare what portion of the new bid relates to the Assets as compared to the Purchase Price.

g.  Property is being conveyed "as is."

h.  As set forth in the APA, to the extent the Debtor ultimately contracts to sell the Assets to a competing bidder, the Debtor recognizes the Buyer as a "stalking horse" and thus has agreed to an expense reimbursement in the amount of $40,000 (the "Expense Reimbursement") payable to the Buyer at closing. This amount is the estimated expenses that the Buyer has incurred and is incurring in conducting due diligence, negotiating, documenting and consummating the transaction.

i.  Any party submitting a bid must agree that its deposit shall be held and its agreement at its last bid price shall remain open and binding until the later of Closing on the Successful Bidder, or July 1, 2016.

j.  To the extent the Successful Bidder fails to close, its deposit shall be forfeited and Debtor may close immediately with the confirmed second highest bid without need for further notice and hearing.

20.    The offer made by the Buyer is deemed a Qualified Bid and nothing shall prevent the Buyer from making additional bids for the Assets at the Sale Hearing. Buyer shall be entitled to a credit in the amount of the Expense Reimbursement in addition to any secured claims that Buyer

7

may hold and be entitled to credit bid pursuant to Section 363(k) of the Bankruptcy Code and to be credited towards Buyer's Purchase Price.

21.    The Bid Procedures allow the Debtor to conduct the Sale Hearing in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtor will receive the best possible consideration for the Assets.  Bid procedures should be approved when they provide a benefit to the estate by maximizing the value of the assets and enhance competitive bidding.  Calpine Corp. v. O'Brien Envtl. Energy, Inc., 181 F.3d 527, 535-37 (3d Cir. 1999) (detailing situations where bidding incentives are appropriate in bankruptcy because they provide a benefit to the estate). The Debtor asserts that the Bid Procedures are consistent with other procedures previously approved in other bankruptcy courts in this circuit.

22.    Although the Debtor believes that the value to be provided pursuant to the current APA is fair and reasonable, the Debtor submits that the Bid Procedures and the Sale Hearing will ensure that the Debtor's estate receives the highest or best value available by allowing the market to test the Purchase Price for the Assets.  The Debtor hereby requests this Court's approval of the process and procedures set forth in the Bid Procedures for the submission and consideration of competing bids from other interested parties for the Assets.

## THE SALE APPROVAL ORDER

23.    Finally, and most importantly, the Debtor seeks the entry of an order pursuant to section 363 of the Bankruptcy Code, approving any Asset Purchase Agreement and the sale of the Assets in all respects, free and clear of any and all liens, claims, encumbrances and interests in or on the Assets.  The Sale Approval Order reflects the terms of the current APA but will ultimately reflect the terms of a finalized APA.

8

24. Pursuant to section 541 of the Bankruptcy Code, the property to be sold to the Buyer under the APA (the "Sale"), are assets of the Debtor's bankruptcy estate.

25. In accordance with sections 363, 1107 and 1108 of the Bankruptcy Code, debtors-in-possession are authorized to sell property of the estate and maximize recoveries for their creditors.

26. Section 363(b) of the Bankruptcy Code authorizes a debtor or a trustee to sell its assets outside of the ordinary course of business. See 11 U.S.C. § 363(b)(1).

27. Section 363(f) of the Bankruptcy Code provides, in pertinent part, as follows:

> (f) [t]he trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

28. Generally, a debtor must show that each of the following elements have been met before a section 363(b) sale may be approved: (i) that a sound business reason exists for the proposed transaction; (ii) that the sale has been proposed in good faith; (iii) that the sale price is fair and reasonable; and (iv) that accurate and reasonable notice has been provided of the transaction. See In re WDH Howell, LLC, 298 B.R. 527, 534 (D. N.J. 2003); In re Stroud Ford, Inc., 163 B.R. 730 (Bankr. M.D. Pa. 1993).

29.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  In re Dura Automotive, 2007 Bankr. LEXIS 2764 at *258, (citing Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996)); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Del. And Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1991) (same).

30.     Courts have made it clear that a debtor's showing of a sound business justification need not be exhaustive, but rather a debtor or trustee is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin-United Com., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

31.     Whether or not there are sufficient business reasons to justify a sale depends upon the facts and circumstances of each case.  In re Lionel Com., 722 F.2d 1063, 1071 (2d Cir. 1983).

32.     In the circumstances of valid business justifications, applicable principles of law attach to a debtor's decision a strong presumption "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11), (quotations omitted).

33.    Therefore, the Debtor submits that the decision to sell the Assets is based upon its sound business judgment and should be approved.  The Debtor worked diligently to explore alternatives to the proposed sale.  However, the current economic climate resulted in the Debtor's determination that the sale of the Assets is a necessary step towards a successful and meaningful distribution to the Debtor's creditors.  The Debtor thus believes that the sale of the Assets will provide the best result for its estate and creditors.

34.    Once a court is satisfied that there is a sound business justification for the proposed sale, the court should then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  In re Del. and Hudson Ry. Co., 124 B.R. at 166; accord In re Decora Indus., Inc., Case No. 00-4459, 2002 WL 32332749, at *3 (Bankr. D. Del. May 20, 2002.).

35.    "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the  sale proceedings."  In Re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 142, 147 (3d Cir. 1986).  "Typically, the misconduct that would destroy s purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Id.

36.    Here, the APA was negotiated at arm's length after a marketing process conducted by the Debtor over the last two (2) months.

37.    The Buyer, is not controlled by, or acting on behalf of any insider of the Debtor.

11

38.    The Buyer is offering Louis Leof, the Debtor's principal, an employment agreement for a proposed annual base salary of $76,960. The Debtor avers that this sum is below market and not a means of shifting sale proceeds to the Principal.

39.    The Buyer is negotiating a new lease agreement with the Debtor's current lessor, in which Louis Leof is one of the owners.

40.    Prior to the filing of the Bankruptcy Case, the Buyer provided a secured loan in the amount of $54,000 to the Debtor, which was guaranteed by Louis Leof, the Debtor's principal, so that the Debtor would be able to retain counsel to continue to negotiate and prepare for filing this Bankruptcy Case and to maintain operations as a going concern. In addition, the Debtor and Buyer contemplate that Buyer will extend debtor-in possession financing (as further described in a motion for its approval) in an amount which it is anticipated will not exceed $40,000 so that the Debtor will have enough cash to operate pending a sale of the Assets.

41.    Moreover, the proposed APA is to be submitted subject to the receipt of higher and better offers. Thus, the Debtor submits that the proposed sale to Buyer constitutes a sale in good faith and for fair value within meaning of Section 363 of the Bankruptcy Code and, specifically, should be afforded the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets. See id.

42.    Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser. Section 363(m) provides,

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such

12

entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. §363(m).

43.     Section 363(m) of the Bankruptcy Code thus protects the good faith purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets.  Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code 365.  See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d Cir. 1998).  In Krebs, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)."  Id. at 497.  Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.  Like the franchise agreements protected in Krebs, the Debtor respectfully submits that section 363(m) applies to protect the Buyer (or other successful bidder) with respect to the Assets and any ancillary assignments thereof.

44.     Although the Bankruptcy Code does not define "good faith," the Third Circuit has noted that the phrase "encompasses one who purchases in 'good faith' and 'for value.'"  In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986).  Further, the Third Circuit has recognized that the type of misconduct that would destroy a purchaser's good faith status involves

13

'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' Id. (remanding case involving insider transaction back to the bankruptcy court for further consideration of good faith where there was evidence that the sale had been orchestrated between insiders and some of the sale conditions were not disclosed to the debtor's creditors) (quoting In re Rock Indus. Machine Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." See, e.g., In re Stroud Ford, Inc., 163 B.R. 730, 732-33 (Bankr. M.D. Pa. 1993); In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Machine Corp., 572 F.2d at 1198).

45.     As will be further demonstrated at the Sale Hearing, the sale of the Assets was proposed in good faith as a result of arms'-length negotiations between the Debtor and the Buyer. In addition, the sale of the Assets to the Buyer is subject to higher or better offers pursuant to the Bid Procedures which are designed not only to solicit potential competing bidders, but to ensure that no party is able to exert undue influence over the process. Under such circumstances, the Debtor submits that the Buyer (or successful bidder, if not the Buyer) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

46.     The Debtor believes that the prompt sale of the Assets, as proposed, is in the best interests of the creditors and the estate. The Debtor believes that the Purchase Price is fair and reasonable under the circumstances.

47.     In the interest of attracting the best offers, the Sale of the Assets should be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with holders of any such liens, claims and encumbrances being paid from the

proceeds of the Sale of the Assets and/or being given replacement liens, claims, and encumbrances attaching to the proceeds of the Sale of the Assets.

48.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

49.    The Debtor requests that the Court authorize the Sale of the Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Liens and Claims"). The Sale of the Assets pursuant to the Bid Procedures will satisfy section 363(f) of the Bankruptcy Code because any entities holding liens and claims will have received notice of this Motion and the Sale Notice. All parties in interest will be given sufficient opportunity to object to the relief requested herein and any such entity that does not object to the Sale of the Assets should be deemed to have consented. See Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of

objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Twp. of Pemberton (In re Tabone, Inc., 175 B.r. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)). As such, to the extent that no party holding a lien or claim objects to the relief requested in the Sale Order, the Sale of the Assets free and clear of all liens and claims satisfies section 363(f)(2) of the Bankruptcy Code. To the extent a party holding a lien or claim objects to the relief requested in the Sale Order, the Sale of the Assets free and clear of such liens and claims satisfies one or more of sections 363(f)(1) or (3)-(5), as applicable.

50.    Accordingly, the Debtor requests that the Assets be transferred to the Buyer (or other successful bidder, if not the Buyer) free and clear of all liens, claims, encumbrances, and interests with the same to attach to the net sale proceeds of the Assets.

51.    Finally, the Debtor submits that bidding incentives, such as the Expense Reimbursement, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." See e.g., In re Magic Brands, LLC, 2010 WL 3493041 (Bankr. D. Del. 2010); In re Holley Performance Products, Inc., 2009 WL 7215691 (Bankr. D. Del. 2009); In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); see also In re 995 Fifth Ave. Assoc. L.P., 96 B.R. 24, 28

16

(Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).

52.    A proposed bidding incentive to be paid to a "stalking horse" such as the Break-Up Fee, should be approved when it is in the best interests of the estate. S.N.A. Nut Co., 186 B.R. at 104. Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. Calpine Corp. v. O'Brien Envtl. Energy, Inc., (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context) (hereinafter, "O'Brien"). The O'Brien standard was more recently employed and approved by the Third Circuit in In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir. 2010).

53.    The Third Circuit Court of Appeals in O'Brien has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id.; see also In re ASARCO, L.L.C., 650 F.3d 593 (5th Cir. 2011) (approving break-up fee that promoted increased bidding by reimbursing for due diligence expenses). Second, if the availability of break-up fees and expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

17

54.     In <u>O'Brien</u>, the Third Circuit reviewed nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors are as follows:

(a)     the presence of self-dealing or manipulation in negotiating the break-up fee;

(b)     whether the fee harms, rather than encourages, bidding;

(c)     the reasonableness of the break-up fee relative to the purchase price;

(d)     whether the unsuccessful bidding placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(e)     the ability of the request for a break-up fee to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(f)     the correlation of the fee to a maximization of value of the debtor's estate;

(g)     the support of the principal secured creditors and creditors' committees of the break-up fee;

(h)     the benefits of the safeguards to the debtor's estate; and

(i)     the substantial adverse impact of the break-up fee on unsecured creditors where such creditors are in opposition to the break-up fee.

<u>O'Brien</u>, 181 F.3d at 536.

55.     The Expense Reimbursement requested herein allows the Debtor to set a floor for the Assets and, thus, insist that competing bids be materially higher or otherwise better than the APA, a clear benefit to the Debtor's estate.  Moreover, and of critical importance, the Buyer would not have agreed to act as a stalking horse bidder without the Expense Reimbursement.  Without the benefit of the Buyer as a stalking horse bidder, the bids received at Auction for the Assets could be substantially lower than that offered by the Buyer.

56.     In the present case, for example, potential purchasers of the Assets will be provided with the APA reflecting the terms already negotiated by the Buyer, will have the opportunity to propose changes to those terms, and thereafter will have the opportunity to outbid the Buyer for the Assets.  In this way, potential purchasers will have the benefit of the negotiations and due diligence

18

already undertaken by the Buyer and will thus be more likely to bring their own competing bid and increase competition, and potentially, value to the estate, at the Auction. Further, it is appropriate and reasonable to compensate the Buyer for undertaking the efforts and expenditures to establish a "floor" bid for the Assets, as well as establishing the terms for the sale and assignment of such assets in the event a sale is made to another purchaser. For these reasons, extending bid protections to the Buyer as proposed in the Term Sheet is an exercise of the Debtor's sound business judgment.

57.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. (internal citation omitted).

58.     The Expense Reimbursement in this case is $40,000, calculated as the Buyer's incurred fees and expenses. Under the circumstances and in light of the amount of the total purchase price, the Debtor asserts that the requested expense reimbursement is reasonable and requests that it be approved.

## THE SALE COMPLIES WITH FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004(f)(1).

57.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.

58.     The Debtor believes a sale of the Assets pursuant to a public Auction governed by the proposed Bid Procedures will maximize the sale proceeds received by the estate, which is the paramount goal in any proposed sale of property of the estate. In re Dura Automotive Sys., Inc., Case No. 06-11202(KJC), 2007 Bankr. LEXIS 2764, *253 (Bankr. D. Del. Aug. 15, 2007) ("The

paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.").

## APPROVAL OF THE APA IS WARRANTED

59.     The applicable principle of law with respect to the approval of asset sales in bankruptcy is stated in the case of In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983). The Court in Lionel held that approval of a sale is appropriate if the court finds the transaction represents a reasonable business judgment on the part of the debtor. See also, Stephens Industries v. McClung, 789 F.2d 3863 (6th Cir. 1986); In re Coastal Industries. Inc., 63 B.R. 361 (Bankr. N.D. Ohio 1986), In re Baldwin United Corp., 43 B.R. 888 (Bankr. S.D. Ohio 1984).

60.     In light of the foregoing, the Debtor has determined that the Sale to Buyer on the terms and conditions set forth in the Asset Purchase Agreement are appropriate and in the best interest of its estate and all parties in interest.

61.     It is anticipated that the Sale will enable the Debtor to provide a distribution to secured and unsecured creditors that likely would not be available absent the Sale.

## ASSIGNMENT OF CONTRACTS

62.     The Sale Order shall contain a provision assigning all contracts as identified in the Asset Purchase Agreement.

63.     All counter-parties to such contracts shall receive notice of the proposed assignment as part of the service of the bid procedures order.

64.     The Debtor believes and avers that no cure is due any of these parties outside of the ordinary course within thirty (30) day billings between the Debtor and the counter-party.

65.     The Debtor seeks a provision in the bid procedures order providing a mechanism for any party to assert any default or cure obligations and for that issue to be addressed at the Sale Hearing.

66.     At the Sale Hearing the Debtor will submit an Order assigning those contracts to the Buyer clear of any cure or default as of the Sale Hearing ("Assignment Order").

**WHEREFORE,** the Debtor respectfully request that this Court (i) enter an Order approving the Bidding Procedures and the sale of the Property in a form substantially similar to the attached proposed form of Order, (ii) enter an Order approving the sale of the Assets free and clear of liens, claims, encumbrances and interest, and (iii) grant such other and further relief as this Court deems just.

**CIARDI CIARDI & ASTIN**

Dated: May 17, 2016             By:     */s/ Jennifer C. McEntee*
                                        Albert A. Ciardi, III, Esquire
                                        Jennifer C. McEntee, Esquire
                                        One Commerce Square
                                        2005 Market Street, Suite 3500
                                        Philadelphia, PA 19103
                                        Proposed Attorneys for the Debtor and
                                        Debtor-In-Possession

21