# EXHIBIT A

# ASSET PURCHASE AGREEMENT

among

## FEDERAL IDENTIFICATION CARD CO., INC.
## D/B/A PTM SPORT,

## LOUIS N. LEOF,

and

## PTM PROMOTIONAL, LLC

[_____], 2016

**TABLE OF CONTENTS**

Section

Page

## ARTICLE I
## DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Interpretation | 7 |

## ARTICLE II
## SALE OF ASSETS, ASSUMPTION OF LIABILITIES  AND PURCHASE PRICE

| | | |
|---|---|---|
| 2.1 | Purchase and Sale of Assets | 7 |
| 2.2 | Assumption of Certain Liabilities | 9 |
| 2.3 | Purchase Price; Payment | 9 |
| 2.4 | Prorations and Credits at Closing | 9 |

## ARTICLE III
## CONDITIONS PRECEDENT AND CLOSING

| | | |
|---|---|---|
| 3.1 | Conditions Precedent | 9 |
| 3.2 | Closing Date | 11 |
| 3.3 | Payment of Expense Reimbursement | 12 |
| 3.4 | Items to be Delivered at the Closing by Seller and Shareholder | 12 |
| 3.5 | Items to be Delivered at the Closing by the Buyer | 12 |

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER AND SHAREHOLDER

| | | |
|---|---|---|
| 4.1 | Organization and Related Matters; Capitalization | 13 |
| 4.2 | Financial Statements; Changes; Contingencies | 13 |
| 4.3 | Undisclosed Liabilities | 15 |
| 4.4 | Tax and Other Returns and Reports | 15 |
| 4.5 | Purchased Contracts | 15 |
| 4.6 | Sufficiency of Purchased Assets; Title | 15 |
| 4.7 | Condition of Property | 16 |
| 4.8 | Intangible Property | 16 |
| 4.9 | No Conflicts | 16 |
| 4.10 | Legal Proceedings | 16 |
| 4.11 | Litigation | 16 |
| 4.12 | Insurance | 17 |
| 4.13 | Permits | 17 |
| 4.14 | Compliance with Law | 17 |
| 4.15 | Employee Benefits | 17 |
| 4.16 | Certain Interests | 18 |
| 4.17 | Employees | 18 |
| 4.18 | Bank Accounts, Powers | 18 |
| 4.19 | No Brokers or Finders | 19 |
| 4.20 | Accuracy of Information | 19 |

4.21    Receivables.................................................................................................................19
4.22    Customers...................................................................................................................19
4.23    Environmental Compliance .......................................................................................19
4.24    Powers of Attorney ...................................................................................................20
4.25    Real Property .............................................................................................................20

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

5.1    Organization and Related Matters ...............................................................................20
5.2    Authorization.................................................................................................................20
5.3    No Conflicts ..................................................................................................................20
5.4    No Brokers or Finders....................................................................................................21
5.5    Legal Proceedings..........................................................................................................21

## ARTICLE VI
## COVENANTS

6.1    Tax Cooperation ...........................................................................................................21
6.2    Employment Matters......................................................................................................21
6.3    Proration Payments........................................................................................................22
6.4    Noncompetition, Nondisclosure and Nonsolicitation Obligations ...............................22
6.5    Change of Name ............................................................................................................24

## ARTICLE VII
## INDEMNIFICATION

7.1    Survival of Representations and Warranties .................................................................24
7.2    Indemnification and Reimbursement by the Seller and Shareholder............................24
7.3    Indemnification and Reimbursement by the Buyer .......................................................25
7.4    Matters Involving Third Parties....................................................................................25
7.5    Limitation on Indemnification; Calculation of Losses.................................................26
7.6    Payment of Losses out of Escrow .................................................................................26

## ARTICLE VIII
## GENERAL

8.1    Amendments; Waivers...................................................................................................26
8.2    Schedules; Exhibits; Integration...................................................................................26
8.3    Further Assurances .......................................................................................................27
8.4    Governing Law; Disputes..............................................................................................27
8.5    Binding Effect; Assignment .........................................................................................27
8.6    Headings........................................................................................................................27
8.7    Counterparts ..................................................................................................................27
8.8    Publicity and Reports....................................................................................................27
8.9    Confidentiality ..............................................................................................................27
8.10   No Third-Party Beneficiaries.......................................................................................27
8.11   Notices ..........................................................................................................................28
8.12   Expenses........................................................................................................................29

8.13    Remedies; Waiver ................................................................................................29
8.14    Representation By Counsel; Interpretation ...........................................................29
8.15    Specific Performance ..........................................................................................29
8.16    Severability .........................................................................................................29

**Exhibits**

Exhibit A        Escrow Agreement (To be supplied)
Exhibit B        Form of Sale Order

**Schedules**

**[To be updated]**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of _____, 2016, by and among **PTM Promotional, LLC**, a Pennsylvania limited liability company ( the "**Buyer**"), **Federal Identification Card Co., Inc. d/b/a PTM Sport**, a Pennsylvania corporation (the "**Seller**"), Debtor in Possession, and **Louis N. Leof ("Leof")**, a citizen and resident of Pennsylvania (the "**Shareholder**").

### R E C I T A L S

**WHEREAS**, Seller is engaged in the business of the manufacturing and distribution of sports and specialty clothing and apparel (the "**Business**") and is the owner of certain operating assets and records relating to the operation of the Business; and

**WHEREAS**, Seller desires to sell, and Buyer desires to purchase, substantially all of the assets of the Business, on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Shareholder is the majority shareholder of the Seller and, in order to induce the Buyer to enter into this Agreement, Shareholder has elected to join in this Agreement for the purposes of making certain representations, warranties and covenants.

### A G R E E M E N T

In consideration of the mutual promises contained herein and intending to be legally bound, the Parties agree as follows:

### ARTICLE I

### DEFINITIONS

1.1     <u>Definitions</u>.  As used in this Agreement, the following definitions shall apply:

"*Accounts Receivable*" has the meaning specified in <u>Section 2.1(a)(ii)</u>.

"*Action*" means any action, complaint, investigation, petition, suit or other proceeding, whether civil or criminal, in law or in equity, or before any arbitrator or Governmental Entity.

"*Affiliate*" means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, a specified Person.

"*Agreement*" means this Asset Purchase Agreement among the Buyer, the Seller and the Shareholder, together with all exhibits and schedules attached hereto.

"*Approval*" means any approval, authorization, consent, qualification or registration, or any waiver of any of the foregoing, required to be obtained from, or any notice, statement or other communication required to be filed with or delivered to, any Governmental Entity or any other Person.

1

"*Associate*" of a Person means:

(a)     a corporation or organization (other than a Party) of which such Person is a director, manager, an officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities;

(b)     any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar capacity; and

(c)     any relative or spouse of such Person or any relative of such spouse who has the same home as such Person or who is a director or officer of any Affiliate of the Seller.

"*Assumed Liabilities*" has the meaning specified in Section 2.2.

"*Avoidance Actions*" means all claims and causes of action pursuant to Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and all similar causes of action under applicable state laws, including those for recovery of preferential and fraudulent transfers.

"*Bankruptcy Code*" means chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 et seq.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Pennsylvania.

"*Benefit Plan*" means each "employee benefit plan" as defined in Section 3(3) of ERISA, whether written or unwritten or subject to ERISA, as well as each employee or director benefit or compensation plan, arrangement or agreement (whether written or unwritten) and each employment, consulting, bonus, supplemental income, collective-bargaining, incentive or deferred compensation, vacation, share purchase, option or other equity-based, severance, termination, retention, change-in-control, profit-sharing, fringe benefit, workers' compensation, voluntary employees' beneficiary association, health, welfare, accident, sickness, death benefit, hospitalization, insurance, personnel policy, disability benefit or other similar plan, program, agreement, arrangement or commitment (whether written or unwritten) for the benefit of any current, former or retired employee, consultant, independent contractor, other service provider or director of the Seller or any of its ERISA Affiliates (as defined herein) entered into, maintained or contributed to by the Seller or any of their ERISA Affiliates or to which the Seller or any of its ERISA Affiliates is obligated to contribute.

"*Bill of Sale*" has the meaning specified in Section 3.4(a).

"*Business*" has the meaning specified in the Recitals.

"*Business Day*" means any day other than (a) Saturday or Sunday or (b) any other day on which banks in Pennsylvania are permitted or required to be closed.

"*Buyer*" has the meaning specified in the first paragraph of this Agreement.

"*Buyer Indemnified Persons*" has the meaning specified in Section 7.2.

"*Closing*" means the consummation of the Transactions.

"*Closing Date*" means the date of the Closing.

2

"*COBRA*" has the meaning specified in Section 6.2(d).

"*Confidential Information*" has the meaning specified in Section 6.4(b).

"*Contract*" means any agreement, arrangement, bond, commitment, franchise, indemnity, indenture, instrument, lease, license or understanding, whether or not in writing, to which the Seller is a party or beneficiary.

"*Credit Bid*" means the amount that Buyer may bid pursuant to Section 363(k) of the Bankruptcy Code which includes any outstanding amount owed by the Seller under the DIP Facility.

"*DIP Facility*" means that certain financing provided by Buyer to Seller pursuant to Section 364(b) of the Bankruptcy Code approved by the Bankruptcy Court.

"*Effective Time*" means the open of business on the Closing Date.

"*Employees*" has the meaning specified in Section 4.17.

"*Employment Agreement*" has the meaning specified in Section 3.4(d).

"*Encumbrance*" means any claim, charge, lease, covenant, easement, encumbrance, security interest, lien, option, pledge, rights of others or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, understanding, law, equity or otherwise, except for any restrictions on transfer generally arising under any applicable federal or state securities law.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the related regulations and published interpretations.

"*ERISA Affiliate*" means any entity that is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the IRS Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the IRS Code), (c) an affiliated service group (as defined under Section 414(m) of the IRS Code or the regulations under Section 414(o) of the IRS Code) or (d) a "controlled group" within the meaning of Section 4001 of ERISA, any of which includes any of the Seller or any of its subsidiaries.

"*Escrow Agent*" means an individual or entity selected by the Parties and identified and disclosed at or prior to the Sale Hearing.

"*Escrow Agreement*" means that certain Escrow Agreement substantially in the form attached hereto and made a part hereof as Exhibit A between Buyer, Seller and the Escrow Agent.

"*Escrow Funds*" means the funds being held pursuant to Escrow Agreement.

"*Excluded Assets*" has the meaning specified in Section 2.1(a).

"*Final Balance Sheet*" has the meaning specified in Section 3.4(f).

"*Financial Statements*" has the meaning specified in Section 4.2(a).

"*Final Order*" means an order, ruling, judgment, the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court or by any state, commonwealth or other federal court or other court of competent jurisdiction which has not been reversed, vacated, stayed, modified or

amended in any manner and as to which (a) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing certiorari, reargument or retrial is pending or (b) any appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken or granted.

"*Fundamental Representations*" means those representations and warranties (i) referenced in Section 7.1 and (ii) set forth in Section 4.23.

"*GAAP*" means generally accepted accounting principles for financial reporting in the United States, as in effect from time to time.

"*Governmental Entity*" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*Hazardous Substance*" means but shall not be limited to substances that are defined or listed in, or otherwise classified pursuant to, any applicable Laws as "hazardous substances," "hazardous materials," "hazardous wastes" or "toxic substances," or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitibility, corrosivity, reactivity, radioactivity, carcinogenicity, reproductive toxicity or "EP toxicity," and petroleum and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal energy

"*Indemnifiable Claim*" means any Losses for or against which any party is entitled to indemnification under this Agreement.

"*Indemnified Party*" has the meaning specified in Section 7.4(a).

"*Indemnifying Party*" has the meaning specified in Section 7.4(a).

"*Intangible Property*" means any trade secret, secret process, patent, copyright, Marks or other confidential information, know-how or proprietary intellectual property and any and all registrations and applications for registration of any of the foregoing.

"*IRS*" means the United States Internal Revenue Service or any successor agency.

"*IRS Code*" means the Internal Revenue Code of 1986, as amended.

"*Knowledge*" has the following meaning: An individual will be deemed to have Knowledge of a particular fact or matter if: (a) that individual is actually aware of that fact or matter or (b) a prudent individual could be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonably comprehensive investigation regarding the accuracy of any representation or warranty contained in this Agreement. A Person (other than an individual) will be deemed to have Knowledge of a particular fact or matter if any individual who is serving, or who has at any time served, as a director, officer, partner, manager, executor or trustee of that Person (or in any similar capacity) has, or at any time had, Knowledge of that fact or matter (as set forth in (a) and (b) above), and any such individual will be deemed to have conducted a reasonably comprehensive investigation regarding the accuracy of the representations and warranties made herein by that Person or individual.

"*Law*" means any constitutional provision, statute or other law, rule, regulation or interpretation of any Governmental Entity and any Order.

4

"*Liability*" means with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"*Loss*" means any Action, cost, damage, disbursement, expense, Liability, loss, deficiency, obligation, penalty or settlement of any kind or nature, whether foreseeable or unforeseeable, including, but not limited to, interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the specified Person; provided, however, that Loss shall exclude any consequential, punitive, indirect, or similar special damages (except for such damages asserted by a third party).

"*Mark*" means any registered and unregistered brand name, domain name, service mark, trademark, email address, telephone number, facsimile number, tradename, and all application for registration of any of the foregoing including, without limitation, "PTM Sport," "Philadelphia T- Shirt Museum," "www.ptmsport.com," and all other ways under which Seller operates, advertises or identifies the Business or its products and services.

"*Order*" means any decree, injunction, judgment, order, ruling, assessment or writ.

"*Ordinary Course of Business*" an action taken by a Person will be deemed to have been taken in the Ordinary Course of Business only if that action:

(a)     is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person;

(b)     does not require authorization by the board of directors, Shareholder, managers or members of such Person (or by any Person or group of Persons exercising similar authority) and does not require any other separate or special authorization of any nature; and

(c)     is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-day operations of other Persons that are in the same line of business as such Person.

"*Shareholder*" has the meaning specified in the first paragraph of this Agreement.

"*Party*" means each of Buyer, Seller and Shareholder.

"*Permit*" means any license, permit, franchise, certificate of authority or order, or any waiver of the foregoing, required to be issued by any Governmental Entity.

"*Person*" means an association, a corporation, a limited liability company, an individual, a partnership, a trust or any other entity or organization, including a Governmental Entity.

"*Procedures Hearing*" means the hearing to be scheduled in the Bankruptcy Court to consider approval of bidding procedures in connection with the Transactions, including a break-up fee to Buyer should Buyer not be the successful bidder for the Business.

5

*"Procedures Order"* means an Order of the Bankruptcy Court, in form and substance acceptable to Purchaser in its sole discretion, that establishes the bidding procedures in connection with the Transactions.

"*Purchase Price*" has the meaning specified in Section 2.3

"*Purchased Assets*" has the meaning specified in Section 2.1(a).

"*Purchased Contracts*" has the meaning specified in Section 2.1(a).

"*Qualified Benefit Plan*" has the meaning specified in Section 4.15(d).

"*Representative*" means, with respect to a particular Person, any director, officer, manager, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"*Restricted Business*" has the meaning specified in Section 6.4(c).

"*Retained Liabilities*" has the meaning specified in Section 2.2.

*"Sale Hearing"* means the hearing to be scheduled in the Bankruptcy Court to consider approval of the Transactions.

"*Sale Order*" shall be an Order of the Bankruptcy Court, in form and substance acceptable to Buyer in its sole discretion, approving the Transactions, and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the Transactions contemplated hereby as further specified in Section 3.1(a)(i) below.

"*Seller*" has the meaning specified in the first paragraph of this Agreement.

"*Seller Indemnified Person*" has the meaning specified in Section 7.3.

"*Tax*" means any foreign, federal, state, county or local income, sales and use, excise, franchise, real and personal property, transfer, gross receipts, unclaimed property, escheat, capital stock, production, business and occupation, disability, employment, payroll, severance or withholding tax or charge imposed by any Governmental Entity, any interest and penalties (civil or criminal) related thereto or to the nonpayment thereof, and any Losses in connection with the determination, settlement or litigation of any Tax Liability.

"*Tax Return*" means a report, return or other information required to be supplied to a Governmental Entity with respect to Taxes.

"*Third-Party Claim*" has the meaning specified in Section 7.4(a).

"*Territory*" has the meaning specified in Section 6.4c).

"*Transactions*" means the transactions contemplated by this Agreement and the other Transaction Documents.

"*Transaction Documents*" means this Agreement and each of the other agreements, instruments, consents, certificates and other documents delivered pursuant to this Agreement, including without limitation, the Sale Order and the Escrow Agreement.

**1.2**    __Interpretation__. Except as otherwise expressly provided herein, for purposes of this Agreement the following rules shall apply:

(a)    the terms defined in this <u>Article I</u> have the meanings assigned to them in this <u>Article I</u> and include the plural as well as the singular;

(b)    all accounting terms not otherwise defined herein have the meanings assigned under GAAP;

(c)    all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement;

(d)    pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms; and

(e)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision.

**ARTICLE II**

**SALE OF ASSETS, ASSUMPTION OF LIABILITIES
AND PURCHASE PRICE**

**2.1**    <u>Purchase and Sale of Assets</u>.

(a)    <u>Purchased Assets</u>.  Subject to the terms and conditions of this Agreement, at the Closing Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of the assets, properties, rights, privileges and claims of every kind and nature, real and personal, tangible and intangible, absolute or contingent, wherever located, of the Business (the "**Purchased Assets**"), except for the assets specifically listed on <u>Schedule 2.1(b)</u> (the "**Excluded Assets**"). The Purchased Assets shall include, but shall not be limited to, the following:

(i)    All machinery, apparatus, furniture and fixtures, materials, supplies, tools and other equipment of every type owned or leased by the Seller and used in the Business, all of which are set forth on <u>Schedule 2.1(a)(i)</u>.

(ii)    All of Seller's accounts receivable and work in process for services and products for customers as of the date of Closing, whether or not billed as of such date, attributable to the Business (the "*Accounts Receivable*").

(iii)    All inventory of usable goods, including all merchandise, raw materials, work in progress, finished products and other tangible personal property held for sale or lease or used by the Business as of the date of Closing.

(iv)    All of Seller's rights and interests arising under or in connection with any Contracts that relate to the Business which are specifically identified by Buyer on Schedule 2.1(a)(iv) (the "**Purchased Contracts**"). To the extent applicable, the Seller shall assume and assign Purchased Contracts pursuant to Section 365 of the Bankruptcy Code at Closing and any cure amounts ("Cure Amounts") shall be paid by Buyer subject to Section 2.3 herein.

7

(v)    All of Seller's prepaid expenses associated with the Purchased Assets, all of which are set forth on Schedule 2.1(a)(v).

(vi)    All of the computer hardware and software (and all associated manuals), including, but not limited to, all websites, owned or leased by the Seller and used by the Business, all of which are set forth on Schedule 2.1(a)(vi). To the extent applicable, the Seller shall assume and assign any such contracts or leases pursuant to Section 365 of the Bankruptcy Code at Closing and any Cure Amounts shall be paid by Buyer subject to Section 2.3 herein.

(vii)    All sales data, customer lists, information relating to customers, suppliers' and vendors' names, mailing lists and, if any, and all rights thereto relating to the Business.

(viii)    All of the Intangible Property that Seller has an interest in and that is used by the Business, whether or not registered with the U.S. Copyright Office, including all drawings, patterns, data, information, or procedures relating to such intellectual property used in connection with the Business, including without limitation, Seller's web-site(s), domain name(s), telephone and fax numbers, the Marks; and all goodwill associated with the Business; books and records relating to the Business (provided, however, that Seller shall be permitted to retain copies of financial records and Tax Returns related to the Business) and the Employees; and Permits required by the Business to operate as operated as of the date hereof (to the extent assignment is permitted by applicable Law).

(ix)    All flyers, stationery, advertising text, photographs, business cards and other intellectual property of all kinds owned by Seller and relating to the Business; all insurance benefits, including rights and proceeds, arising from or relating to the Purchased Assets or Assumed Liabilities on or prior to the Closing Date, unless excluded in accordance with this Agreement.

(x)    All rights, claims, credits, causes of action, including Avoidance Actions, or rights of set-off of Seller against third parties relating to the Purchased Assets or the Business, whether choate or inchoate, known or unknown, contingent or noncontingent, including all such claims listed on Schedule 2.1(a)(x).

(xi)    All of Seller's rights under any non-competition, non-disclosure and non-piracy-provisions contain in agreements entered into by Seller with any current or former director, officer, shareholder or employee of Seller including all such rights listed on Schedule 2.1(a)(xi).

(b)    Excluded Assets. The assets that constitute Excluded Assets shall mean the following:

(i)    all minute books, stock records and corporate seals of the Seller.

(ii)    all bank accounts, securities and cash of Seller.

(iii)    all of Seller's rights and interests arising under or in connection with any Tax refund that relates to the Business.

(iv)    the Purchase Price received by Seller at and after the Closing and pursuant to the Escrow Agreement.

(v)    all insurance policies and rights thereunder except as provided in Section 2.1(a)(ix).

(vi)    those assets listed on Schedule 2.1(b).

**2.2    Assumption of Certain Liabilities**. In consideration for the assignment and transfer of the Purchased Assets and subject to the terms and conditions of this Agreement, at the Closing Buyer shall assume (a) the Liabilities specifically identified in Schedule 2.2 (collectively, the "**Assumed Liabilities**"). Except for the Assumed Liabilities, Buyer shall not assume, shall not take subject to and shall not be liable for any Liability of Seller or Shareholder. All Liabilities of Seller (or Shareholder) other than the Assumed Liabilities (the "**Retained Liabilities**") shall remain the responsibility of and shall be retained, paid, performed and discharged solely by Seller or Shareholder, as the case may be. For the avoidance of doubt, all expenses of the Seller related to the Transactions shall be Retained Liabilities.

**2.3    Purchase Price; Payment**. In consideration for the assignment and transfer of the Purchased Assets, the Buyer shall deliver to Seller at the Closing an amount by wire transfer of immediately available funds equal to $413,000 (the "**Purchase Price**"), less (i) any Credit Bid (ii) any Cure Amounts, and (iii) $40,000, which $40,000 shall be paid to the Escrow Agent pursuant to the terms of the Escrow Agreement.

**2.4    Prorations and Credits at Closing**.

(a)    The Parties agree that to the extent not otherwise provided for in this Agreement, the following expenses of the Business shall be calculated and prorated as of the Closing, and Seller shall be responsible for the period prior to the Closing and Buyer shall be responsible for the period after the Closing:

(i)    personal property Taxes to the extent relating to the Business or the Purchased Assets; and

(ii)    charges for rent, electric, fuel, gas, telephone, sewer and other utility charges, in each case to the extent relating to the Business.

(b)    In the event that, as of the final determination of the final figures above have not been received or determined on any of the adjustments, prorations or costs which are to be adjusted pursuant to this Section 2.5, the Parties shall calculate these sums using adjustments and prorations reasonably estimated by Seller and Buyer, subject to later readjustment and true-up when such final figures have been obtained.

## ARTICLE III

## CONDITIONS PRECEDENT AND CLOSING

**3.1    Conditions Precedent**. The obligations of Buyer to purchase and of Seller to sell the Purchased Assets to Buyer pursuant to the terms of this Agreement shall be subject to the satisfaction of the following conditions on or prior to the Closing Date.

(a)    Conditions Precedent - All Parties. The respective obligations of each of the Parties to this Agreement to effect the Transactions contemplated herein shall be subject to the satisfaction of the following conditions on or prior to the Closing Date:

(i)    The Sale Order attached hereto as Exhibit B, with only such modifications as Buyer, in its sole discretion, may agree to , approving Seller's Section 363 sale of the Purchased

9

Assets under Chapter 11 of the Bankruptcy Code obtained in connection with the consummation of the Transactions contemplated hereby shall have been granted on or before June 24, 2016 at 5:00 p.m. provided, however, that if the Parties so agree, they may close the Transactions even if an appeal of the Sale Order is pending or subject to a motion for rehearing or reconsideration, so long as no stay of the Sale Order is then in effect.

(ii)    None of the parties to this Agreement shall be subject to any statute, rule, regulation, injunction or other Order or decree which shall have been enacted, entered, promulgated or enforced by any governmental entity which prohibits, restricts or makes illegal consummation of the transactions contemplated hereby.

(b)    Conditions Precedent – Buyer.  The obligations of Buyer to effect the transactions contemplated by this Agreement shall be subject to satisfaction of the following conditions at or prior to the Closing Date, unless waived by Buyer:

(i)    Buyer shall have the right to undertake a complete business, legal and accounting due diligence investigation of the Business, the Assets and the other matters contemplated by the terms of this Agreement through the second business day preceding the Procedures Hearing ("**Due Diligence Period**").  Such due diligence investigation may include, but shall not be limited to the inspection and examination of the following: the Purchased Assets, financial statements, environmental assessment of the real property leased by Seller, agreements, Contracts, other assets, products, methods of accounting, computer systems and programs, computer conversion methods, profit and cost margins, business records, sales records and analysis of productivity by employee, commission schedules, customer lists, and supplier lists.  Buyer shall be completely satisfied, in its sole and absolute discretion, with the results of such due diligence investigation and shall notify Seller in writing of its dissatisfaction or completion of the due diligence investigation, in which event, this Agreement shall be consummated in accordance with its terms and conditions.  If Buyer is not completely satisfied with the results of such due diligence investigation, Buyer shall notify Seller in writing, in which event, this Agreement shall terminate and no party hereto shall have any further rights or obligations hereunder.  In connection with this due diligence investigation, Seller shall make all necessary information available to Buyer, including sufficient access to Seller's offices, systems, customers, suppliers, records, financial data and employees.

(ii)    The Procedures Order shall have been entered, with only such modifications as Buyer, in its sole and absolute discretion, may approve.

(iii)    The Sale Order shall have been granted, with only such modifications as Buyer, in its sole and absolute discretion, may approve.

(iv)    The representations and warranties of Seller and Shareholder set forth in Article IV hereof shall be true and correct in all material respects as of the Closing Date except any representation and warranty which specifically relates to an earlier date.

(v)    Seller and the Shareholder shall have performed in all material respects all obligations and covenants required to be performed by it or them pursuant to this Agreement on or prior to the Closing Date.

(vi)    No action, suit, investigation or other proceeding shall be pending or threatened against any party to this Agreement which, in the reasonable opinion of Buyer, could result in (i) the restraint or prohibition of any such party, or the obtaining of damages or other relief from any

10

such party, in connection with this Agreement or the transactions contemplated hereby or (ii) an order restricting Seller in conducting its business as now conducted or to be conducted by Buyer.

(vii)    Seller shall have executed and delivered to Buyer all Assignments of Fictitious Name for all Marks in each jurisdiction Buyer deems appropriate, together with such other certificates and such other documents as Buyer may reasonably request.

(viii)    To the best of Seller's Knowledge, Seller's Employees (hereinafter defined), other than the Shareholder, will remain as employees at will with Buyer in positions comparable with those they hold now with Seller upon completion of the Transactions contemplated hereunder.

(ix)    At the close of business on the day prior to the Closing Date, the Accounts Receivable, adjusted to eliminate (1) all receivables that are ninety (90) days or more past due, (2) related party receivables; and (3) any receivables that are subject to set-off or contra accounts, shall have an aggregate book value of no less than $70,000, as reflected on the Final Balance Sheet.

(x)    Buyer shall have secured an acceptable lease agreement in form and substance acceptable to Buyer, in its sole and exclusive discretion, by and between Llanerch Realty Associates, LP , as lessor, and the Buyer, as lessee, with respect to the premises (the "**Premises**") located at 2502 Township Line Road, Upper Darby Township, Drexel Hill, PA 19026 (the "**Lease Agreement**") duly executed by the lessor;

(xi)    Seller shall have delivered to Buyer, all in such form as Buyer may reasonably specify, duly executed bills of sale, assignments of leases and contracts and such other good and sufficient instruments of assignment, transfer and conveyance as shall be necessary or advisable to vest in Buyer all of Seller's right, title and interest in and to the Purchased Assets and rights attendant to the Purchased Contracts and Assumed Liabilities.

(c)    Conditions Precedent – Seller and the Shareholder.  The obligations of Seller and the Shareholder to effect the transactions contemplated by this Agreement shall be subject to the satisfaction of the following conditions on or prior to the Closing Date, unless waived by Seller and Shareholder:

(i)    The representations and warranties of Buyer set forth in Article V  hereof shall be true and correct in all material respects as of the Closing Date except any representation and warranty which specifically relates to an earlier date.

(ii)    Buyer shall have performed in all material respects all obligations and covenants required to be performed by them pursuant to this Agreement on or prior to the Closing Date.

(iii)    Buyer shall have delivered to Seller a certified or bank cashier's check or wire transfer in the amount of the Purchase Price less any required escrows, reserves, or holdbacks.

(iv)    Buyer shall have assumed the Purchased Assets and the Assumed Liabilities by execution and delivery of an assumption agreement reasonably acceptable to Seller.

3.2    Closing Date.  Upon the terms and subject to the conditions set forth in this Agreement, the Closing shall take place upon satisfaction of all the conditions precedent set forth under Section 3.1 at the offices of Barry D. Kleban, Esq. of McElroy, Deutsch, Mulvaney & Carpenter, LLP at 1 Penn

11

Center – Suburban Station, 1617 JFK Boulevard, Suite 1500, Philadelphia, PA 19103, or at such other place, date and time as mutually agreed upon by the Parties.

      **3.3**    **Payment of Expense Reimbursement.**  In the event that Buyer is not the prevailing bidder in the bankruptcy proceedings, Buyer shall be paid an expense reimbursement in the amount of $40,000 with such payment to be made at the closing of such sale to the successful bidder.

      **3.4**    **Items to be Delivered at the Closing by Seller and Shareholder**.  At the Closing, Seller shall deliver or cause to be delivered to Buyer.

      (a)    A Bill of Sale, Assignment and Assumption Agreement dated as of the date of Closing (the "**Bill of Sale**") duly executed by Seller;

      (b)    Such other instruments of transfer dated as of the Closing Date necessary or appropriate to transfer to and vest in the Buyer all of the Seller's right, title and interest in and to the Purchased Assets including, without limitation, those necessary to assign the Purchased Contracts;

      (c)    The Escrow Agreement duly executed by Seller;

      (d)    An employment agreement in form and substance acceptable to Buyer, in its sole discretion, (the "**Employment Agreement**"), duly executed by Louis N. Leof.

      (e)    A certificate executed by Shareholder as President of Seller, in form and substance reasonably satisfactory to the Buyer, certifying that (i) attached thereto is a true, correct and complete copy of (A) the Articles of Incorporation, as amended, of Seller, certified as of a recent date by the Pennsylvania Department of State, (B) the By Laws of Seller, and (C) resolutions duly adopted by the Board of Directors and the requisite shareholders of Seller authorizing the performance of the Transactions and the execution and delivery of the Transaction Documents to which Seller is a party, (ii) the resolutions referenced in subsection (i)(C) are still in effect, and (iii) that all of the representations and warranties made by Seller and Shareholder in Article IV of this Agreement and the Transaction Documents to which the Seller is a party are true and correct as of the Closing Date;

      (f)    A list (current as of the Closing Date) of all Accounts Receivable and a related aging schedule together with a final balance sheet setting forth all Liabilities of Seller as of the date of Closing (the "*Final Balance Sheet*");

      (g)    The keys to all locks associated with the Premises covered by the Lease Agreement (and any and all cards, devices or things necessary to access the Premises covered by the Lease Agreement);

      (h)    All other certificates, consents and other documents referred to herein as then deliverable by the Seller.

      (i)    Payment in full by wire of any amount due and owing pursuant to the DIP Facility at Closing unless offset as part of the Purchase Price in Section 3.5(a).

      **3.5**    **Items to be Delivered at the Closing by Buyer**.  At the Closing,  Buyer shall deliver to Seller:

      (a)    The Purchase Price (whether by cash, Credit Bid or combination thereof) due at the Closing pursuant to Section 2.3;

(b)    The Bill of Sale duly executed by Buyer;

(c)    Such other instruments of assumption dated as of the Closing Date necessary or appropriate to transfer to and vest in Buyer all of Seller's obligations under the Assumed Liabilities, including, without limitation, those necessary to assign the Purchased Contracts;

(d)    A certificate of existence for the Buyer issued by the Pennsylvania Department of State, dated within 10 days of the Closing Date;

(e)    The Escrow Agreement duly executed by Buyer;

(f)    The Employment Agreement duly executed by Buyer; and

(g)    All other certificates, consents and other documents referred to herein as then deliverable to Buyer.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF
## SELLER AND SHAREHOLDER

Seller and Shareholder hereby jointly and severally represent, warrant and agree as follows:

4.1    Organization and Related Matters; Capitalization.

(a)    Seller is a for-profit Pennsylvania corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania. Seller has all necessary power and authority to own its properties and assets and to carry on its businesses as now conducted and is duly qualified or licensed to do business as a corporation in good standing in all jurisdictions except where the failure to be so qualified or licensed is not and will not have a material adverse effect on the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole. True, correct and complete copies of the Articles of Incorporation, as amended, and By Laws of Seller as in effect on the date hereof have been delivered to the Buyer. Subject to Bankruptcy Court approval, Seller has all necessary power and authority, and the Shareholder have the legal capacity, to execute, deliver and perform this Agreement and each of the other Transaction Documents to which each is a party and to consummate the Transactions. Seller has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Transaction Documents to be executed and delivered by it. This Agreement has been, and the other Transaction Documents to be executed and delivered by Seller and Shareholder at the Closing will be, duly executed and delivered by each of them and constitute the legal, valid and binding obligation of the Seller and the Shareholder enforceable against each of them in accordance with their respective terms.

(b)    Seller does not have any investment in, or joint venture arrangements with, any other Person. Seller does not have any Subsidiaries, nor does Seller own any securities or other instruments that are or could become convertible into equity.

4.2    Financial Statements; Changes; Contingencies.

(a)    Financial Statements. Set forth on Schedule 4.2(a) are the following financial statements (collectively, the "**Financial Statements**"): (i) reviewed balance sheets and statements of income and cash flow as of and for the fiscal year ended December 31, 2014; (ii) unreviewed balance sheets and

13

statements of income and cash flow as of and for the fiscal year ended December 31, 2015 (the "**Most Recent Fiscal Year End**") for Seller; and (iii) internal balance sheets and statements of income as of and for the three months ended March 31, 2016 (the "**Most Recent Financial Statements Date**") for the Seller (the "**Most Recent Financial Statements**"). The Financial Statements for the Seller are complete and correct in all material respects, present fairly the financial condition of the Seller as of such dates and the results of operations of Seller for such periods, are consistent with the books and records of Seller (which books and records are correct and complete).

(b)    <u>No Material Adverse Changes</u>.  Since the Most Recent Fiscal Year End, Seller has conducted its Business only in the Ordinary Course of Business and, except as set forth on <u>Schedule 4.2(b)</u>:

(i)    there has not been, occurred or arisen any casualty, loss, damage or destruction (whether or not covered by insurance) of any of the Purchased Assets with a book value in excess of $5,000 or that has involved or may involve a loss to Seller of more than $5,000;

(ii)    Seller has not abandoned or let lapse, sold, leased, transferred, or assigned any material assets, tangible or intangible;

(iii)    Seller has not entered into any material Contract outside the Ordinary Course of Business (except for this Agreement and other Contracts to be entered into in connection with this Agreement).

(iv)    Seller has not accelerated, terminated, made material modifications to, or canceled any Material Contract outside the Ordinary Course of Business.

(v)    Seller has not imposed any Encumbrance upon any of its assets, tangible or intangible other than those Encumbrances set forth on <u>Schedule 4.2(c)(v)</u>.

(vi)    Including equipment and real estate leases, Seller has not created, incurred, assumed, or guaranteed Indebtedness other than those Liabilities set forth on <u>Schedule 4.2(b)(viii)</u>.

(vii)    Seller has not issued, sold, or otherwise disposed of any of its equity interests, or granted any options, warrants, equity-based awards or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its equity interests.

(viii)    Seller has not declared, set aside, or paid any dividend or made any distribution with respect to its equity interests (whether in cash or in kind) or redeemed, purchased, or otherwise acquired any of its equity interests.

(ix)    Seller has not entered into any employment or similar Contract or any collective bargaining agreement, or modified the terms of any existing such Contract or agreement (except for this Agreement and agreements to be entered into in connection with this Agreement).

(x)    Seller has not granted any increase in the compensation or fringe benefits of any of its current or former directors, officers, and employees.

(xi)    Seller has not established, adopted, amended, modified, or terminated any Benefit Plan.

   (xii) Seller has not made any other material change in employment terms for any of its current or former directors, officers, and employees.

   (xiii) Seller has not made any loans or advances of money.

   (xiv) Seller has not agreed or committed to any of the foregoing.

  **4.3**  **Undisclosed Liabilities**. Seller (with respect to the Business) does not have any material Liabilities of any kind, whether absolute, accrued, contingent or otherwise except for (a) Liabilities shown on the balance sheet of the Most Recent Financial Statements, (b) Liabilities which have arisen since the March 31, 2016 in the Ordinary Course of Business, (c) Liabilities, if any, related to or arising from any item noted on the Schedules hereto or any item that would have been disclosed on the Schedules hereto but for any materiality or other dollar thresholds established for disclosures required thereon, in each case to the extent that the nature of the Liability related to or arising from any such item or omitted item is reasonably apparent on the face of such disclosure or description of items required to be disclosed, and (d) Liabilities arising in the Ordinary Course of Business (and not from breach or default) from performance obligations under any Contracts.

  **4.4**  **Tax and Other Returns and Reports**. Except as set forth on <u>Schedule 4.4</u>, Seller has timely filed or will file all required Tax Returns and has paid (or will pay with respect to income taxes due for the period ending March 31, 2016) all Taxes due for all periods ending on or before March 31, 2016. The Seller has delivered to the Buyer all Tax Returns filed by the Seller for the two-year period ending on December 31, 2014. All required Tax Returns, including amendments to date, have been prepared in good faith without negligence or willful misrepresentation, have been timely filed and are complete and accurate in all material respects. Except as set forth on <u>Schedule 4.4</u>, all Taxes owed by the Seller (whether or not shown on any Tax Return) have been paid. No claim has ever been made by an authority in a jurisdiction where the Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. Except as set forth on <u>Schedule 4.4</u>, Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed. Except as set forth on <u>Schedule 4.4</u>, no Governmental Entity has, during the past three years, examined or is in the process of examining any Tax Returns of Seller. Seller is not or has it been a party to any "reportable transaction," as defined in IRS Code §6707A(c)(1) and Reg. §1.6011-4(b).

  **4.5**  **Purchased Contracts**. Each Purchased Contract was entered into in the Ordinary Course of Business. True, correct and complete copies of each Purchased Contract appearing on <u>Schedule 2.1(a)(iv)</u>, including all amendments and supplements, have been delivered to Buyer. Each such Purchased Contract is a legal, valid and binding obligation of the Seller and, to the Knowledge of Seller and Shareholder, is a legal, valid and binding obligation of each other party thereto. Except as set forth on Schedule 4.5, Seller has duly performed all of its obligations thereunder to the extent that such obligations to perform have accrued; and no breach or default, alleged breach or default, or event that would (with the passage of time, notice or both) constitute a breach or default thereunder by Seller (or, to the Knowledge of Seller and Shareholder, any other party or obligor with respect thereto), has occurred or as a result of this Agreement or its performance will occur.

  **4.6**  **Sufficiency of Purchased Assets; Title**.

   (a)  The Purchased Assets represent all the assets that are currently used by the Business, and no other assets are necessary in order to conduct the Business following the Closing Date in the same manner as the Business was conducted prior to the Closing Date.

(b)    Seller has good and marketable title to each of the Purchased Assets, free and clear of any Encumbrances except for those Encumbrances set forth on Schedule 4.6. Seller has all rights, power and authority to sell, convey, assign, transfer and deliver the Purchased Assets to Buyer in accordance with the terms of this Agreement.

**4.7    Condition of Property.** All tangible Purchased Assets have been regularly and appropriately maintained, repaired and replaced; are not materially defective, except for ordinary wear and tear; and are adequate for the purposes for which they are presently being used in the Business.

**4.8    Intangible Property.**

(a)    Schedule 4.8 contains a complete and correct list of all Seller's Intangible Property used in the Business. Seller has complete rights to and ownership of all Intangible Property used in connection with the Business. Seller does not use any Intangible Property by consent of any other Person and is not required to and does not make any payments to others with respect thereto.

(b)    Seller has in all material respects performed all obligations required to be performed by it, and is not in default in any material respect under, any Contract relating to any of the foregoing. To the Knowledge of Seller and Shareholder, none of the Intangible Property or any use by Seller of any such property conflicts with or infringes (or allegedly conflicts with or infringes) the rights of any Person.

**4.9    No Conflicts.** The execution, delivery and performance by Seller and Shareholder of the Transaction Documents to which they are a party will not violate, or constitute a breach or default (whether upon lapse of time or the occurrence of any act or event or otherwise) under, the Articles of Incorporation, as amended, By Laws or Shareholders' Agreement of Seller or, except as otherwise set forth in Schedule 4.9, any Purchased Contract, result in the imposition of any Encumbrance against any of the Purchased Assets or violate any Law. Schedule 4.9 lists all Permits and Approvals required to be obtained by Seller to consummate the Transactions.

**4.10    Legal Proceedings.** Except as set forth on Schedule 4.10, there is no Order or Action pending, or, to the Knowledge of Seller and Shareholder, threatened, against or affecting Seller or Shareholder or any of its or his properties or assets that individually or when aggregated with one or more other Orders or Actions has or if determined adversely might reasonably be expected to have a material adverse effect on the Business, the Purchased Assets (or the use, operation or value thereof), the Assumed Liabilities, or Seller's or Shareholder's ability to perform each of its obligations under each of the Transaction Documents to which each is a party. Schedule 4.10 lists each Order and each Action that involves a claim or potential claim and which relates to the Business, the Purchased Assets or Assumed Liabilities. There is no matter related to the Business, the Purchased Assets or Assumed Liabilities as to which Seller or Shareholder has received any notice, claim or assertion, or, to the Knowledge of Seller and Shareholder, which otherwise has been threatened or is reasonably expected to be threatened or initiated, against or affecting any Representative of the Seller or any other Person, nor to the Knowledge of the Seller and the Shareholder is there any reasonable basis therefor, in connection with which any such Person has or may reasonably be expected to have any right to be indemnified by the Seller.

**4.11    Litigation.** Schedule 4.11 sets forth each instance in which Seller or Shareholder (i) any of its or his assets, rights or properties is subject to any outstanding injunction, judgment, Order, decree, ruling, or charge or (ii) is a party to any Action. To the Knowledge of Seller and Shareholder, no Action is threatened (including cease and desist letters or invitations to take a patent license) against Seller or Shareholder or any of its or his assets, rights, properties, or the Business.

**4.12**    <u>Insurance</u>. <u>Schedule 4.12</u> lists all insurance policies and bonds currently maintained by or on behalf of the Seller.  Such policies and bonds are in full force and effect, and all premiums due thereon, to the extent required to be paid on or prior to the date hereof, have been paid.  Seller is not in default under any such policy or bond.  Seller has timely filed claims with its insurers with respect to all material matters and occurrences for which it has coverage under such policies.

**4.13**    <u>Permits</u>.  Seller holds all Permits that are required by any Governmental Entity to permit it to conduct and operate the Business as now conducted, and all such Permits are valid and in full force and effect and will remain in full force and effect upon consummation of the Transactions, except for those Permits identified on <u>Schedule 4.13</u> as not transferable to Buyer.  All transferable Permits are Purchased Assets.  To the Knowledge of Seller and Shareholder, no suspension, cancellation or termination of any of such Permits is threatened or imminent that could reasonably be expected to have a material adverse effect on the Business, the Purchased Assets or the Assumed Liabilities.

**4.14**    <u>Compliance with Law</u>.  To Seller's and Shareholder's knowledge, Seller is, and has been at all times during the preceding five-year period, in compliance in all material respects with all applicable Laws.

**4.15**    <u>Employee Benefits</u>.

(a)    <u>Schedule 4.15</u> lists each Benefit Plan.

(b)    With respect to each Benefit Plan, Seller has made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, employee handbooks and any other written communications (or a description of any oral communications) relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the IRS Code, a copy of the most recent determination, opinion or advisory letter from the IRS; (vi) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the most recently filed Form 5500, with schedules attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the most recently completed plan years; and (viii) copies of material notices, letters or other correspondence from the IRS, Department of Labor or Pension Benefit Guaranty Corporation relating to the Benefit Plan.

(c)    There are no negotiations, demands or proposals that are pending or have been made that concern matters now covered, or that would be covered, by the Benefit Plans now in effect.

(d)    Each Benefit Plan has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the IRS Code).  Each Benefit Plan that is intended to be qualified under Section 401(a) or 408(c) of the IRS Code (a "**Qualified Benefit Plan**") is so qualified and has received a favorable and current determination letter from the IRS, or with respect to a prototype plan, can rely on an opinion letter from the IRS to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the IRS Code, and nothing has occurred that could reasonably be expected to cause the revocation of such determination

17

letter from the IRS or the unavailability of reliance on such opinion letter from the IRS, as applicable, nor has such revocation or unavailability been threatened.

(e)    Seller has performed all of its obligations under all Benefit Plans and all such Benefit Plans have been operated in compliance with their terms. To the Knowledge of Seller and Shareholder, there are no Actions (other than routine claims for benefits) pending or threatened against such Benefit Plans or their assets, or arising out of such Benefit Plans, and, to the Knowledge of Seller and Shareholder, no facts exist that could give rise to any such Actions. No Benefit Plan has within the three years prior to the date hereof been a participant in an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Entity.

(f)    Buyer shall have no Liability with respect to any of the Seller's or its ERISA Affiliates' Benefit Plans (or any claims related thereto), including those plans listed on Schedule 4.15 and the Seller shall remain liable for all amounts due or to become due under all such plans and agreements.

4.16    **Certain Interests**. Except as set forth on Schedule 4.16, no Affiliate of Seller nor any officer, director or shareholder thereof, nor any Associate of any such individual, has any material interest in any of the Purchased Assets, the Assumed Liabilities or any property used in or pertaining to the Business; and Seller is not indebted or otherwise obligated to any such Person, except for amounts due under normal arrangements applicable to all employees generally as to salary or reimbursement of ordinary business expenses not unusual in amount or significance. The consummation of the Transactions will not (either alone, or upon the occurrence of any act or event, or with the lapse of time, or both) result in any benefit or payment (severance or other) arising or becoming due from Seller or the successor or assign of any thereof to any Person except as such benefit or payment may relate to accrued paid leave included in Assumed Liabilities.

4.17    **Employees**.

(a)    Schedule 4.17(a) contains a complete list of Seller's employees and independent contractors that work in the Business (the "**Employees**"), including name, job title, base compensation rate, exempt or non-exempt classification, accrued but unused paid leave balance, and whether or not he/she has a written employment or independent contractor agreement. Except as set forth on Schedule 4.17(a), all of the Employees are terminable at will by Seller at any time with no severance or other post separation pay being due. To the Knowledge of Seller and Shareholder, the Employees set forth on Schedule 4.17(a) have the present intention to accept employment with the Buyer if such employment is offered by Buyer and the offer includes compensation and benefits substantially similar to those provided by Seller.

(b)    To the Knowledge of Seller and Shareholder, none of the Employees is a party to any confidentiality, non-competition, non-interference, intellectual property, proprietary rights or other such agreement with any Person other than the Seller that purports to prevent or limit the activities of such Employee in connection with the Business. Seller has complied in all material respects with all applicable Laws related to the Employees, including but not limited to all Laws related to employment practices, terms and conditions of employment, wages, nondiscrimination, Form 1-9s, and health and safety.

4.18    **Bank Accounts, Powers**. Schedule 4.18 lists each bank, trust company, savings institution, brokerage firm, mutual fund or other financial institution with which Seller has an account or safe deposit box for use by the Business and the names and identification of all Persons authorized to

18

draw thereon or to have access thereto, and lists the names of each Person holding powers of attorney or agency authority from the Seller and a summary of the terms thereof.

**4.19     No Brokers or Finders.** Except as set forth on Schedule 4.19, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by or acting on behalf of Seller in connection with the negotiation, execution or performance of this Agreement or the Transactions, is or will be entitled to any brokerage or finder's or similar fee or other commission as a result of this Agreement or the Transactions.

**4.20     Accuracy of Information.** All information furnished by or on behalf of Seller and Shareholder to Buyer, its agents or representatives in connection with Seller, the Business, the Purchased Assets, the Excluded Assets, the Assumed Liabilities and the Retained Liabilities, this Agreement, including, without limitation, each of the schedules and exhibits attached hereto and each of the representations and warranties made by Seller and Shareholder in this Article IV, and the Transaction Documents  is true and complete in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make any statement therein not misleading.

**4.21     Receivables.** All the Accounts Receivable, whether reflected on the Most Recent Financial Statements, the Final Balance Sheet or otherwise, represent sales actually made in the Ordinary Course of Business, and are current and, to the Knowledge of Seller and Shareholder, fully collectible net of any reserves shown on the balance sheet (which reserves were calculated on a basis consistent with GAAP and past practices) within 90 days. Seller has delivered to the Buyer a complete and accurate aging list of all the Accounts Receivable as of May 13, 2016. During the 12 months prior to the Closing Date, Seller has used consistent collection practices in the Ordinary Course of Business and there has been no material change or modification to any of the following in connection with the Business; (x) billing and collection policies, procedures and practices with respect to Accounts Receivable; (y) policies, procedures and practices with respect to the provision of discounts, rebates or allowances; or (z) payment policies, procedures or practices with respect to accounts payable.

**4.22     Customers.** Seller has provided Buyer with a complete list of all customers of Seller, with respect to the Business, for each of the two most recent fiscal years and set forth opposite the name of each such customer the percentage of net sales for the Business attributable to such customer (each, a "**Customer**"). Since April 31, 2016, Seller has not been in any dispute with any of the Customers or received any written or, to the Knowledge of Seller or the Shareholder, oral notice from any Customer to the effect that such Customer intends to cease doing business or significantly reduce the volume of its business or otherwise materially alter the terms of its business with Seller or with Buyer operating the Business

**4.23     Environmental Compliance.** Except as set forth in Schedule 4.23, (a) Seller with reference to the Business and the Purchased Assets has not generated, used, transported, treated, stored, released or disposed of, or has suffered or permitted anyone else to generate, use, transport, treat, store, release or dispose of any Hazardous Substance in violation of any Law; (b) there has not been any generation, use, transportation, treatment, storage, release or disposal of any Hazardous Substance in connection with the conduct of the Business or the use of any property or facility of Seller used by the Business or, to the Knowledge of Seller and Shareholder, any nearby or adjacent properties that has created or might reasonably be expected to create any Liability under any Law or that would require reporting to or notification of any Governmental Entity; (c) no asbestos or polychlorinated biphenyl or underground storage tank is contained in or located at any facility of Seller that is used by the Business; (d) any Hazardous Substance handled or dealt with in any way in connection with the Business whether before or during Shareholder's ownership, has been and is being handled or dealt with in all respects in compliance with all applicable Laws; (e) Seller has furnished to the Buyer complete copies of all reports

19

of inspections of the Business and Purchased Assets made through the date hereof pertaining to environmental matters, including any environmental assessments, and all records pertaining to communications with Governmental Entities relating to past or current violations of environmental Laws or an environmental Permit; (f) Seller, Shareholder, the Purchased Assets and the operation of the Business are and have been in material compliance with all applicable environmental Laws; (g) Seller has not received any written notice from any Governmental Entity or any other Person regarding any actual or alleged violation of environmental Laws, or any liabilities or potential liabilities for investigation costs, cleanup costs, response costs, corrective action costs, personal injury, property damage, natural resources damages or attorney fees under environmental Laws or with respect to any Hazardous Substance; and (h) to the Knowledge of Seller and Shareholder, Seller has not assumed or retained, by contract or operation of Law, any Liabilities under any environmental Laws or concerning any Hazardous Substance that could reasonably be expected to materially affect Seller, the Purchased Assets or the Business.

**4.24** **Powers of Attorney**.  Seller has not given any power of attorney (irrevocable or otherwise) to any Person for any purpose relating to the Business, the Purchased Assets or the Assumed Liabilities, other than powers of attorney given to regulatory authorities in connection with routine qualifications to do business.

**4.25** **Real Property**.  Set forth on Schedule 4.25 is a complete list of all real property leases, subleases and occupancy agreements to which Seller is a party related to the Business (the "*Premises*"). Seller has not occupied any other real property (leased or owned) other than the Premises in the past three years in connection with the operation of the Business.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

The Buyer represents, warrants and agrees as follows:

**5.1** **Organization and Related Matters**.  Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania.  Buyer has all necessary corporate power and authority to carry on its business as now being conducted and shall, immediately after the Closing, have full corporate or other power and authority to conduct the Business and to own the Purchased Assets as and in the places where such business and assets are conducted, owned or operated by Seller, except where the failure to be so qualified would not have a material adverse affect on the Business, taken as a whole.  Buyer has all necessary corporate power and authority to execute, deliver and perform this Agreement and each of the other Transaction Documents to which it is a party and to consummate the Transactions.

**5.2** **Authorization**.  The execution, delivery and performance by Buyer of this Agreement and each of the other Transaction Documents to which it is a party have been duly and validly authorized by the members of Buyer and by all other necessary corporate action on the part of Buyer.  This Agreement and each of the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws and equitable principles relating to or limiting creditors' rights generally.

**5.3** **No Conflicts**.  The execution, delivery and performance by Buyer of this Agreement and each of the other Transaction Documents to which it is a party will not violate the provisions of, or

20

constitute a breach or default (whether upon lapse of time and/or the occurrence of any act or event or otherwise) under (a) the Certificate of Formation or operating agreement of Buyer, (b) any Law to which Buyer is subject or (c) any agreement to which Buyer is a party that is material to the financial condition, results of operations or conduct of the business of Buyer. The execution, delivery and performance by Buyer of this Agreement and each of the other Transaction Documents to which it is a party will not require filing or registration with, or the issuance of any Permit by, any third party or Governmental Entity.

      **5.4**    **No Brokers or Finders**. Except as set forth on <u>Schedule 5.4</u>, no agent, broker, finder or investment or commercial banker, or other Person or firms engaged by or acting on behalf of the Buyer in connection with the negotiation, execution or performance of this Agreement or the Transactions, is or will be entitled to any broker's or finder's or similar fees or other commissions as a result of this Agreement or the Transactions.

      **5.5**    **Legal Proceedings**. There is no Order or Action pending or to the Knowledge of Buyer, threatened against or affecting Buyer that individually or when aggregated with one or more other Orders or Actions has or might reasonably be expected to have a material adverse effect on the Buyer's ability to perform this Agreement or any other aspect of the Transactions.

## ARTICLE VI

## COVENANTS

      **6.1**    **Tax Cooperation**. After the Closing, Buyer and Seller shall each cooperate fully with the other and its Representatives in the preparation of such Party's Tax Returns and shall provide, or cause to be provided at the requesting Party's sole cost and expense, to the Requesting Party any records and other information requested by the requesting Party or its Representatives in connection therewith as well as access to, and the cooperation of, the non-requesting Party's accountants. After the Closing, Seller and Shareholder shall cooperate fully with the Buyer in connection with any Tax investigation, audit or other proceeding relating to the Business and Buyer shall provide any records to Seller and Shareholder at Seller's or Shareholder's sole cost and expense with regard to Shareholder's or Seller's collection of any Tax refunds relating to the Business. Any information obtained pursuant to this <u>Section 6.1</u> or pursuant to any other section of this Agreement providing for the sharing of information or the review of any Tax Return or other schedule relating to Taxes shall be subject to <u>Section 8.9</u>.

      **6.2**    **Employment Matters**.

      (a)    <u>Employees</u>. As of the Closing Date, Buyer may, at its option, offer employment to those Employees set forth on <u>Schedule 4.17(a)</u> on such terms and conditions as may be mutually agreed upon by the Buyer and such Employees. Seller shall not take any action, directly or indirectly, to prevent or discourage any such Employee from being employed by Buyer as of the Closing Date and shall not solicit, invite, induce or entice any such Employee to remain in the employ of the Seller or otherwise attempt to retain the services of any such Employee, except with the prior written consent of Buyer.

      (b)    <u>Cooperation and Records</u>. With respect to each Employee hired by Buyer, Seller shall, to the extent permitted by applicable Law, provide Buyer with access to and copies of all personnel files, grievance and arbitration files, health and safety files, negotiation files, and all other files relating to such Employees.

      (c)    <u>No Third Party Beneficiaries</u>. Nothing herein, express or implied, is intended to confer on any active or retired employee of Seller or his or her legal or other representatives or beneficiaries any

rights or remedies of any nature or kind whatsoever under or by reason of this Agreement including, without limitation, any right to continued employment or to any severance or other benefits from Seller, Buyer or any of their respective ERISA Affiliates.

(d)     COBRA.  Seller shall be responsible for obligations under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("**COBRA**") with respect to any employee of Seller or qualified beneficiary thereof whose "qualifying event" for COBRA purposes has occurred on or prior to the Closing, and with respect to any employee or any qualified beneficiary thereof who does not accept the Buyer's offer of employment.

**6.3     Proration Payments**.  If any provision hereof requires the proration between Buyer and Seller of obligations to third parties including employees or former employees, each Party agrees to pay promptly upon demand by the other Party (accompanied by a reasonably itemized statement of the claim and basis therefor and supporting documentation from such other Party) its proportionate share of the obligations that it has assumed hereunder.

**6.4     Noncompetition, Nondisclosure and Nonsolicitation Obligations**.

(a)     Acknowledgments by the Parties.  Seller and Shareholder acknowledge that (i) the Business, as operated by Seller prior to the date of this Agreement is national in scope; (ii) the products and services related to such Business are marketed throughout the United States; and  (iii) the Business as operated by the Seller prior to the date of this Agreement, competes with other businesses that are or could be located in any part of the United States. Each Party acknowledges that  (iv) Buyer has required that the other Parties  make the covenants set forth in this Section 6.4 as a condition to the Buyer's purchase of the Purchased Assets; (v) the provisions of this Section 6.4 are reasonable and necessary to protect and preserve Buyer's interests in and right to the use and operation of the Purchased Assets from and after the Closing Date; and (vi) Buyer would be irreparably damaged upon Seller's or the Shareholder's  breach the covenants set forth in this Section 6.4.

(b)     Nondisclosure of Confidential Information.  Seller and Shareholder, respectively, acknowledge and agree that the protection of the Confidential Information pending and after the Closing hereunder is necessary to protect and preserve the value of the Purchased Assets. Therefore, Seller and Shareholder hereby agree not to disclose to any Persons or use for their own account or for the benefit of any Person any Confidential Information of the Seller or disclosed by the Buyer, whether or not such information is embodied in writing or other physical form, without the Buyer's written consent, unless and to the extent that the Confidential Information is or becomes generally known to and available for use by the public other than as a result of Seller's or Shareholder's, as the case may be,  fault or the fault of any other Person bound by a duty of confidentiality to Buyer or Seller.  As used herein, "**Confidential Information**" means, in each case only to the extent related to the Business,: (i) any and all trade secrets concerning the business and affairs of Seller, product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing and distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs (including object code and source code), database technologies, systems, structures, architectures and processes, improvements, devices, discoveries, concepts, methods  and any other information, however documented, that is a trade secret within the meaning of the Laws of the applicable jurisdiction; (ii) any and all information concerning the business and affairs of the Seller or Buyer before or after the Transactions hereunder  (which includes historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, contractors, agents, suppliers and potential suppliers, personnel training techniques and materials, purchasing methods and techniques,

22

however documented); and (iii) any and all notes, analysis, compilations, studies, summaries and other material prepared by or for Seller or Buyer containing or based, in whole or in part, upon any information from Seller or Buyer, as the case may be, included in the foregoing.

(c)    Noncompetition and Nonsolicitation. As an inducement to enter into this Agreement, the Seller and Shareholder agree that for a period of three (3) years after the Closing Date:

(i)    Unless upon the request and for the benefit of Buyer or any successor or assign of Buyer, the Seller and Shareholder will not, directly or indirectly, engage in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be associated with or in any manner connected with, or render services or advice or other aid to, or guarantee any obligation of, any Person engaged in or planning to become engaged in the Restricted Business, anywhere within the Territory. As used in this Section 6.4(c), "**Restricted Business**" means any business that is competitive with the Business as operated by the Seller during the twelve-month period prior to the Closing Date. As used in this Section 6.4(c), "**Territory**" means the **United States of America**. The Seller and each of the Shareholder agrees that this covenant is reasonable with respect to its duration, geographical area and scope;

(ii)    Neither Seller nor Shareholder may, directly or indirectly, (A) induce or attempt to induce any employee of Buyer to leave the employ of Buyer; (B) in any way interfere with the relationship between Buyer and any such employee; (C) employ or otherwise engage as an employee, independent contractor or otherwise any such personnel of Buyer; or (D) induce or attempt to induce any customer, supplier, distributor of goods or services, vendor or other Person to cease doing business with Buyer or in any way interfere with the relationship between any such customer, supplier, vendor or other Person and Buyer;

(iii)    Neither Seller nor Shareholder may disparage Buyer, the Purchased Assets, the Assumed Liabilities, the Business formerly conducted by Seller, the Business conducted by the Buyer using the Purchased Assets, or any shareholder, director, officer, employee or agent of Buyer or Seller, as the case may be.

In the event of a breach of any covenant set forth in this Section 6.4(c), the term of such covenant will be extended by the period of the duration of such breach.

(d)    Remedies. Upon breach of any of the covenants set forth in this Section 6.4, Buyer will be entitled to the following remedies: (i) damages from the breaching Party; and (ii) in addition to its right to damages and any other rights it may have, to obtain injunctive or other equitable relief pursuant to Section 8.15 to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of this Section 6.4, it being agreed that money damages alone would be inadequate to compensate the non-breaching Party and would be an inadequate remedy for such breach. The Parties agree that Buyer shall not be required to post any bond to obtain any such injunction. The breaching Party further agrees that Buyer shall be entitled to its costs and reasonable attorneys' fees relating to any such proceeding or any other legal action to enforce the terms of this Agreement. The rights and remedies of Buyer in this Section 6.4 are cumulative and not alternative, and are in addition to any other remedies the non-breaching Party has under this Agreement or by Law.

(e)    Severability. Whenever possible, each provision and term of this Section 6.4 will be interpreted in a manner to be effective and valid, but if any provision or term of this Section 6.4 is held to be prohibited or invalid, then such provision or term will be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of

23

such provision or term or the remaining provisions or terms of this Section 6.4. If any of the covenants set forth in this Section 6.4 are held to be unreasonable, arbitrary or against public policy, such covenants will be considered divisible with respect to scope, time and geographic area, and in such lesser scope, time and geographic area, will be effective, binding and enforceable against the Seller and each of the Shareholder to the greatest extent permissible.

     6.5    **Change of Name.** Seller shall cease using any and all fictitious names and shall file such notices and amendments of the Bankruptcy Court caption to eliminate all references to such fictitious names no later than one Business Day after the Closing.

**ARTICLE VII**

**INDEMNIFICATION**

     7.1    **Survival of Representations and Warranties**. All representations, warranties, covenants and obligations in this Agreement shall survive the date of this Agreement and the consummation of the Transactions. Notwithstanding the foregoing, the representations and warranties contained in or made pursuant to this Agreement shall survive the Closing for a period of twelve (12) months, except that (a) the representations and warranties contained in Sections 4.1, 4.4, 4.6(b), 4.8, 4.15, and 4.19 (by Seller and Shareholder) or in Sections 5.2 and 5.4 (by Buyer) (collectively, the *"Fundamental Representations"*) shall survive the Closing and shall continue through the expiration of the applicable statute of limitations, and any tolling thereof, and (b) if a claim or notice is given under Article VII with respect to any representation or warranty before the applicable expiration date, such representation or warranty shall continue indefinitely until the applicable claim is finally resolved.

     7.2    **Indemnification and Reimbursement by Seller and Shareholder**. Seller and Shareholder, jointly and severally, will indemnify and hold harmless the Buyer, and its Representatives, Associates and Affiliates and each of the successors and permitted assigns of the Buyer and its Affiliate (collectively, the **"Buyer Indemnified Persons"**), and will reimburse the Buyer Indemnified Persons for any Losses arising from or in connection with:

     (a)    any breach of any representation or warranty made by Seller or Shareholder in (i) this Agreement or (ii) any Transaction Document or any other certificate, document, writing or instrument delivered by Seller or Shareholder pursuant to this Agreement;

     (b)    any breach of any covenant or obligation of the Seller or Shareholder in this Agreement or in any Transaction Document or any other certificate, document, writing or instrument delivered by the Seller or any Owner pursuant to this Agreement;

     (c)    any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding made, or alleged to have been made, by any Person with the Seller or any Owner (or any Person acting on their behalf) in connection with any of the Transactions;

     (d)    the operation of the Business by the Seller prior to Closing, except with respect to the Assumed Liabilities;

     (e)    any Benefit Plan established or maintained by the Seller or any ERISA Affiliate; or

     (f)    any Retained Liabilities;

24

provided the Buyer Indemnified Person(s) make a written claim for indemnification within the applicable survival period.

      **7.3**      **Indemnification and Reimbursement by the Buyer**. Buyer will indemnify and hold harmless Seller and its Representatives, Associates and Affiliates and each of the successors and permitted assigns of the Seller and its Affiliates (the "**Seller Indemnified Persons**"), and will reimburse the Seller Indemnified Persons for any Losses arising from or in connection with:

      (a)      any breach of any representation or warranty made by the Buyer in (i) this Agreement or (ii) in any certificate, document, writing or instrument delivered by the Buyer pursuant to this Agreement;

      (b)      any breach of any covenant or obligation of the Buyer in this Agreement or in any other certificate, document, writing or instrument delivered by the Buyer pursuant to this Agreement;

      (c)      any Assumed Liabilities; or

      (d)      the operation of the Buyer after the Closing;

provided the Seller Indemnified Person(s) make a written claim for indemnification within the applicable survival period.

      **7.4**      **Matters Involving Third Parties**.

      (a)      If any third party shall notify any Party seeking indemnification hereunder (the "**Indemnified Party**") with respect to any matter (a "**Third-Party Claim**") which may give rise to a claim for indemnification against another Party (the Party against whom indemnification is sought, the "**Indemnifying Party**") under this Section 7, then the Indemnified Party shall promptly (and in any event within 5 Business Days after receiving notice of the Third-Party Claim) notify each Indemnifying Party thereof in writing. Failure to so timely notify shall not relieve the Indemnifying Party from its obligations hereunder unless (and solely to the extent) the Indemnifying Party is actually prejudiced as a result thereof.

      (b)      Any Indemnifying Party will have the right at any time within 30 Business Days of being notified by the Indemnified Party of such Third-Party Claim to assume and thereafter conduct the defense of the Third-Party Claim with counsel of her or its choice, reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnified Party (not to be unreasonably withheld) unless the judgment or proposed settlement involves only the payment of money damages in an amount less than the limitations, if any, provided under Section 7.5 with respect to the Indemnifying Party's indemnification obligations under Section 7, does not involve any admission of fault or violation of Law by or on behalf of the Indemnified Party and does not impose an injunction or other equitable relief upon the Indemnified Party.

      (c)      Unless and until an Indemnifying Party assumes the defense of the Third-Party Claim as provided in Section 7.4(b), however, or if the Indemnifying Party fails to diligently conduct the defense of such Third-Party Claim, the Indemnified Party may defend against the Third-Party Claim in any manner it may reasonably deem appropriate, with the Indemnifying Party responsible for all reasonable costs incurred in connection therewith (including reasonable fees and expenses of counsel).

(d)     In no event will the Indemnified Party consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the prior written consent of each of the Indemnifying Parties (not to be unreasonably withheld).

(e)     The Parties shall cooperate in the defense of all third-party claims that may give rise to Indemnifiable Claims hereunder.  In connection with the defense of any claim, each Party shall make available to the Party controlling such defense, any books, records or other documents within its control that are reasonably requested in the course of and/or necessary or appropriate for such defense.

**7.5     Limitation on Indemnification; Calculation of Losses.**

(a)     Seller and Shareholder will not have Liability with respect to claims under Section 7.2(a) until the total of all Losses actually suffered by the Buyer Indemnified Persons with respect to such claims exceeds $5,000 (the "**Basket**"), at which point the Seller will be obligated to indemnify for all such Losses in excess of the Basket; provided, however, that any claim related to a breach of the Fundamental Representations will not be subject to or counted towards the Basket.  The maximum aggregate Liability of the Seller and the Shareholder with respect to claims under Section 7.2(a) will be limited to $40,000 (the "**Cap**") deposited into Escrow; provided, however, that with respect to claims under Section 7.2(a) for the breach of any Fundamental Representation, the Cap shall equal the Purchase Price  payments (as adjusted pursuant to this Agreement).   Notwithstanding anything to the contrary contained in this Agreement, the limitations on indemnification set forth in this Section 7.5 shall not apply with respect to claims involving fraud, intentional misrepresentation or willful misconduct.

(b)     Notwithstanding anything herein to the contrary, for purposes of determining whether a breach of representation or warranty exists for purposes of Section 7.2(a) and for determining the amount of Losses arising due to the indemnification obligations set forth therein, all qualifications contained in the representations and warranties in this Agreement that are based on materiality and all usages of "material", "material adverse effect" or similar qualifiers will be disregarded.  The amount of any Losses subject to indemnification under this Section 7 shall be net any amounts actually recovered by the Indemnified Party under applicable insurance policies or from any other Person alleged to be responsible therefor.

**7.6     Payment of Losses out of Escrow.**  Seller shall authorize the Escrow Agent to release to Buyer an amount of the Escrow Funds equal to the amount of the Indemnifiable Claim of Buyer.  If the Escrow Funds are insufficient to pay the entire amount of such payments, then Seller and Shareholder must pay (under joint and several liability) Buyer any such deficiency and, if  Seller and Shareholder fail to do so,  Buyer will have the right to pursue any legal remedies available to it to collect such deficiency.

### ARTICLE VIII

### GENERAL

**8.1     Amendments; Waivers.**  This Agreement and any schedule or exhibit attached hereto may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby shall be effective unless in writing and signed by the Party to be bound and then only to the specific purpose, extent and instance so provided.

**8.2     Schedules; Exhibits; Integration.**  Each schedule and exhibit delivered pursuant to the terms of this Agreement shall be in writing and shall constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such

26

schedules and exhibits, constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

**8.3**     **Further Assurances**.  The Parties shall cooperate with each other in such actions and in securing requisite Approvals.  Each Party shall execute and deliver such further certificates, agreements and other documents and take such other actions as the other Party may reasonably request to consummate or implement the Transactions or to evidence such events or matters.

**8.4**     **Governing Law; Disputes.**  The Law of the Commonwealth of Pennsylvania (without regard to any jurisdiction's conflict-of-laws principles) exclusively governs all matters based upon, arising out of or relating in any way to this Agreement and the Transaction Documents, including all disputes, claims or causes of action arising out of or relating to this Agreement or any of the Transaction Documents as well as the interpretation, construction, performance and enforcement of this Agreement or any of the Transaction Documents.  The Bankruptcy Court shall retain jurisdiction to hear and determine disputes arising under this Agreement and the Transaction Documents.

**8.5**     **Binding Effect; Assignment**.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign its rights or delegate its obligations set forth in this Agreement (by operation of Law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void.

**8.6**     **Headings**.  The descriptive headings of the articles, sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

**8.7**     **Counterparts**.  This Agreement and any amendment hereto or any other agreement (or document) delivered pursuant hereto may be executed in one or more counterparts (including by facsimile or e-mailed PDF signature) and by different Parties in separate counterparts.  All of such counterparts shall constitute one and the same agreement (or other document) and shall become effective (unless otherwise therein provided) when one or more counterparts have been signed by each Party and delivered to the other Parties.

**8.8**     **Publicity and Reports**.  The Seller and the Buyer shall coordinate all publicity relating to the Transactions, and no Party shall issue any press release, publicity statement or other public notice relating to this Agreement, or the Transactions, without obtaining the prior consent of both Seller and Buyer.  The Seller shall obtain the prior consent of the Buyer to the form and content of any application or report made to any Governmental Entity that relates or refers to this Agreement.

**8.9**     **Confidentiality**.  All information disclosed by any Party (or its representatives), whether before or after the date hereof, in connection with the Transactions or the discussions and negotiations preceding this Agreement to any other Party (or its representatives) shall be kept confidential by such other Party and its representatives and shall not be used by any such Persons other than as contemplated by this Agreement, except to the extent that such information (a) was known by the recipient when received, (b) it is or hereafter becomes lawfully obtainable from other sources, (c) is necessary or appropriate to disclose to a Governmental Entity having jurisdiction over the Parties, (d) as may otherwise be required by Law, including the Bankruptcy Code and Rules of Bankruptcy Procedure, or (e) to the extent such duty as to confidentiality is waived in writing by the other Party.

**8.10**     **No Third-Party Beneficiaries**.  This Agreement does not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

27

**8.11**   Notices. All notices and other communications under this Agreement must be in writing and will be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written or electronic confirmation of transmission), (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt) or (d) when delivered by email (with written or electronic confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to the Buyer, addressed to:

> PTM Promotional, LLC
> 50 Townview Drive
> Doylestown, PA 18901
> Attn: William Blaser, President
> Telephone: 610-636-2720
> Facsimile: N/A
> Email: billblaser@gmail.com

With a copy to:

> Barry D. Kleban, Esquire
> McElroy, Deutsch, Mulvaney & Carpenter, LLP
> 1 Penn Center- Suburban Station
> 1617 JFK Boulevard, Suite 1500
> Philadelphia, PA 19103-1815
> Telephone: 215-557-2945
> Facsimile: 215-557-2990
> Email: bkleban@mdmc-law.com

If to the Seller, addressed to:

> Federal Identification Card Co., Inc.
> d/b/a PTM Sport
> 2502 W. Township Line Road
> Drexel Hill, PA 19026
> Attn:  Louis N. Leof, President
> Telephone: 610-449-4077 Ext. 103
> Facsimile: 610-449-6635
> Email: lleof@ptmsport.com

With a copy to:

> Albert A. Ciardi, III, Esquire
> Ciardi Ciardi & Astin
> One Commerce Square, Suite 1930
> 2005 Market Street
> Philadelphia, PA 19104
> Telephone: (215) 557-3550, Ext. 103
> Facsimile: 215-557-3551
> Email: aciardi@ciardilaw.com

28

If to the Shareholder, addressed to:

> Louis N. Leof
> 222 E. Marthart Avenue
> Havertown, PA 19083-2415
> Telephone: 610-449-4077 Ext. 103
> Facsimile: 610-449-6635
> Email: lleof@ptmsport.com

**8.12**    **Expenses**.  Seller, Shareholder and Buyer shall each pay its or his own expenses incident to the negotiation, preparation and performance of this Agreement and the Transactions, including but not limited to the fees, expenses and disbursements of its investment bankers, accountants and counsel and of securing third-party consents and approvals required to be obtained by it except as otherwise expressly provided in this Section 8.12. Except to the extent excused by the Bankruptcy Court, the Seller shall pay any documentary transfer tax, real property transfer or gains tax, document-recording fees and charges, and any income, franchise or revenue tax or excise tax (and any surtax thereon) due in connection with the consummation of the Transactions.

**8.13**    **Remedies; Waiver**.  All rights and remedies existing under this Agreement and any related agreements or documents are cumulative to, and not exclusive of, any rights or remedies otherwise available under applicable Law.  No failure on the part of any Party to exercise or delay in exercising any right hereunder shall be deemed a waiver thereof, nor shall any single or partial exercise preclude any further or other exercise of such or any other right.

**8.14**    **Representation By Counsel; Interpretation**.  Seller, Shareholder and Buyer acknowledge that each Party to this Agreement has been represented by, or has had the opportunity to consult with,  counsel in connection with this Agreement and the Transactions.  Accordingly, any rule of Law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to best effect the intent of the Buyer, the Shareholder and the Seller.

**8.15**    **Specific Performance**.  Each Party acknowledges that, in view of the uniqueness of the Business, and the Transactions, the other Parties would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms.  Each Party therefore agrees that the other Party shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

**8.16**    **Severability**.  If any provision of this Agreement is determined to be invalid, illegal or unenforceable by any Governmental Entity, the remaining provisions of this Agreement to the extent permitted by Law shall remain in full force and effect provided that the economic and legal substance of the Transactions is not affected in any manner materially adverse to any Party.  In the event of any such determination, the Parties agree to negotiate in good faith to modify this Agreement to fulfill as closely as possible the original intents and purposes hereof.  To the extent permitted by Law, the Parties hereby to the same extent waive any provision of Law that renders any provision hereof prohibited or unenforceable in any respect.

*[Signature page follows.]*

29

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or caused this Agreement to be executed by its duly authorized officer, as of the day and year first above written.

**BUYER:**
**PTM PROMOTIONAL, LLC**

By: _____

William Blaser, President

**SELLER:**
**FEDERAL IDENTIFICATION CARD CO.,**
**INC. D/B/A PTM SPORT**

By: _____

Louis N. Leof, President

**SHAREHOLDER:**


_____

Louis N. Leof

*Signature Page to Asset Purchase Agreement*